IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Renee Jordan, | : | Case No. 3:13-cv-281 |
| Plaintiff, | : | Judge Rice |
| vs. | : | Magistrate Judge Merz |
| Greater Dayton Premier Management, et al., | : | |
| Defendants. | : | |

---

## PLAINTIFF RENEE JORDAN'S POST-HEARING BRIEF IN SUPPORT OF HER MOTION FOR PRELIMINARY INJUNCTION

---

Debra A. Lavey, #0073259
dlavey@ablelaw.org
Trial Attorney for the Plaintiff
ADVOCATES FOR BASIC LEGAL EQUALITY, INC.
130 W. Second St., Suite 700 E.
Dayton, Ohio 45402
Phone: (937) 535-4411
Fax: (937) 535-4600

Matthew N. Currie, #0078656
mcurrie@ablelaw.org
ADVOCATES FOR BASIC LEGAL EQUALITY, INC.
130 W. Second St., Suite 700 E.
Dayton, Ohio 45402
Phone: (937) 228-8104
Fax: (937) 535-4600

Kerstin Sjoberg-Witt, #0076405
Kevin Truitt, #0078092
ksjoberg-witt@disabilityrightsohio.org
ktruitt@disabilityrightsohio.org
DISABILITY RIGHTS OHIO
50 W. Broad St., Suite 1400
Columbus, Ohio 43215
Phone: (614) 466-7264; Fax: (937) 644-1888

Attorneys for Plaintiff Jordan

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................... 1

II.   STATEMENT OF FACTS .................................................................................... 2

III.    STANDARD OF REVIEW……………………………………………………….5

IV.    LEGAL ARGUMENT

  A.  Ms. Jordan has proven a strong likelihood of success on the merits of her claims against Defendants under Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and the Fair Housing Amendments Act. ....................................... 6

Ms. Jordan has established the elements of her claims under the ADA, Section 504 and FHAA against Defendant GDPM.  GDPM's failure to reasonably accommodate her vision disability by refusing to provide her with audio tapes of written communication, when Ms. Jordan is a participant in the Voucher Program and unable to see to read any written communications, is a violation of Ms. Jordan's rights under the ADA, Section 504 and FHAA.  GDPM's defense that the accommodation is unreasonable because it poses an undue administrative and financial burden is without merit.

  1.   Defendant GDPM has violated Ms. Jordan's rights under Title II of the ADA by refusing her request for reasonable accommodations for her disability, by failing to commuicate effectively with her, and by failing to ensure her equal access to the Voucher Program which it administers. ............................................................................................... 7

  2.   Defendant GDPM has violated Ms. Jordan's rights under Section 504 of the Rehabilitation Act of 1973 by refusing her request for reasonable acccommodations for her disability, by failing to communicate effectively with her, and by failing to ensure her equal access to the Voucher Program which it administers. .......................................................... 12

  3.   Defendant GDPM has violated Ms. Jordan's rights under the Fair Housing Amendments Act by refusing her request for reasonable accommodations for her disability and by failing to communicate effectively with her……………………………………………….15

  4.   Defendant GDPM has failed to prove that granting Ms. Jordan's reasonable accommodation request and communicating effectively with her is an undue administrative and financial burden ............................................................................................... 17

B. Ms. Jordan will suffer irreparable injury if the Court does not grant a preliminary injunction. ................................................................................................................................ 21

Not only should irreparable harm be presumed in this case since it involves housing discrimination and the federal laws underlying Ms. Jordan's claims permit equitable relief to remedy the violations but also Ms. Jordan has demonstrated that she will experience actual irreparable harm if this Court does not grant her motion for preliminary injunction as she will likely lose her voucher, resulting in homelessness.

C. Granting Ms. Jordan the preliminary injunction will not cause substantial harm to others ……………………………………………………………………………………….24

The granting of the preliminary injunction will not cause substantial harm to others. While it would require GDPM to comply with the law and their own written policies, it does not place other participants in the Voucher program at risk of losing their subsidy.

D. Granting Ms. Jordan the preliminary injunction is in the public interest. ........................ 25

The public interest is served by eliminating discrimination against persons with disabilities; therefore, the granting of Ms. Jordan's preliminary injunction would serve the public interest.

V. CONCLUSION: ................................................................................................................. 25

Attachment #1 - Letter of Findings of NonCompliance, January 24, 2014

Attachment #2 - Elaine Letton Deposition transcript

Attachment #3 - Darren Stevens Deposition transcript

# TABLE OF AUTHORITIES

**Cases**

Alexander v. Choate,
    469 U.S. 287 (1985)…………………………………………………………....…13

Chapp v. Bowman,
    750 F.Supp. 274 (W.D. Mich.)…………………………………………....22, 24

Cousins v. Bray,
    297 F. Supp.2d 1027 (S.D. Ohio 2003)…………………………………………21,22

Deck v. City of Toledo,
    29 F.Supp. 2d 431 (N.D. Ohio 1998)……………………………………………….25

Dillery v. City of Sandusky,
    398 F.3d 562 (6th Cir. 2005)……………………………………………………….7

Doherty v. S. Coll. of Optometry,
    862 F.2d 570 (6th Cir. 1988)………………………………………………………..12

Epicenter of Steubenville, Inc. v. City of Steubenville,
    924 F.Supp. 845 (S.D. Ohio 1996)……………………………………………….....21

Gresham v. Windrush Partners, Ltd.,
    730 F.2d 1417 (11th. Cir. 1984)…....……………………………………………….22

Jones v. City of Monroe,
    341 F.3d 474 (6th Cir. 2003)……………………………………………………….7

Kennerly v. ARO, Inc.,
    447 F.Supp. 1090 (E.D. Tenn. 1977)……………………………………………….22

Leary v. Daeschner,
    228 F.3d 729 (6th Cir. 2000) ....................................................... ……………………6

McNamara v. Ohio Building Authority,
    697 F. Supp.2d 820 (N.D. Ohio 2010)……………………………………….....…13

McPherson v. Mich. High Sch. Athletic Ass'n, Inc.,
    119 F.3d 453 (6th Cir. 1997)……………………………………………………….8

Michigan Bell Tel. Co. v. Engler,
    257 F.3d 587 (6th Cir. 2001)……………………………………………………….6

Olmstead v. L.C.,
    527 U.S. 581 (1999)……………………………………………………………….8

Overlook Mut. Homes, Inc. v. Spencer,
    666 F. Supp. 2d 850 (S.D. Ohio 2009)……………………………………...……15

Overstreet v. Lexington Fayette Urban Cnty. Gov't,
    305 F.3d 566 (6th Cir. 2002)………………………………………….………………23

Planned Parenthood Affiliates of Ohio v. Rhodes,
    477 F.Supp. 529 (S.D. Ohio 1979)…………………………………………………...25

Seremeth v. Bd. of County Commissioners Frederick County,
    673 F.3d 333 (4th Cir. 2012)………………………………………………………….8

Six Clinics Holding Corp. II v. Cafcomp Systems,
    119 F.3d 393 (6th Cir. 1997)………………………………………………………….6

Smith & Lee Associates, Inc. v. City of Taylor, Michigan,
    102 F.3d 781 (6th. Cir. 1996)……………………………………………….……17

Stenberg. v. Cheker Oil Co.,
    573 F.2d 921 (6th. Cir. 1978)………………………………………………………..5

Super v. J. D'Amelia & Assocs., LLC,
    2010 WL 3926887 (D. Conn. Sept. 30, 2010)……………………………...……13

Thomas, By and Through Thomas v. Davidson Academy,
    846 F.Supp. 611 (M.D. Tenn. 1994)………………………………………….……25

United Food & Commer. Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.,
    163 F.3d 341 (6th Cir. 1998) ............................................................................. 5

Waters v. Wisconsin Steel Works of Int'l. Harvester Co.,
    502 F.2d 1309 (7th Cir. 1974)……………………………………………………22

Williams v. Rhea,
    2012 WL 2921211 (E.D.N.Y. July 17, 2012)…………………………………………24

Winter v. Natural Res. Def. Council, Inc.,
    555 U.S. 7 (2008)………………………………………………………...…21

**Federal Statutes**

29 U.S.C. § 794(a)……………………………………………………..…12, 22

42 U.S.C. § 1437(a)………………………………………………………………….2

42 U.S.C. § 2003a-3……………………………………………………………...22

42 U.S.C. § 2000e-5(g)………………………………………………………….22

42 U.S.C. § 3602(h)……………………………………………………………...15

42 U.S.C. § 3604(f)……………………………………………………………….15

42 U.S.C. § 3614………………………………………………………………….22

42 U.S.C. § 12101(a)…… ……………………………………………… …...7

42 U.S.C. § 12131…………………………………………………………… ..8

42 U.S.C. § 12132……………………………………………………………..7

**Federal Regulations**

24 C.F.R. § 8.3…………………………………………………………………13, 14

24 C.F.R. § 8.6(a)……………………………………………………...............13, 16

24 C.F.R. § 9.103………………………………………………………………...16

24 C.F.R. § 9.160(a)………………………………………………………….15, 16

24 C.F.R. § 982.155……………………………………………………………...18

24 C.F.R. § 982.551…………………………………………………………...…22

28 C.F.R. § 35.104…………………………………………………………….9, 11

28 C.F.R. § 35.130(a)…………………………………………………………….17

28 C.F.R. § 35.130(b) ………………………………………………………..8, 17

28 C.F.R. § 35.135…………………………………………………………...11, 12

28 C.F.R. § 35.150(a)…………………………………………………………….19

28 C.F.R. § 35.160(a) …………………………………………………………..8, 11

28 C.F.R. § 35.160(b) ………………………………………………………… 9

**Other Authorities**

ADA Title II Technical Assistance Manual …………………………………………………10

## I.    INTRODUCTION

Plaintiff Renee Jordan (hereinafter "Ms. Jordan"), who is legally blind and who is a participant in the Section 8 Housing Choice Voucher Program ("hereinafter "Voucher Program") administered by Defendant Greater Dayton Premier Management (hereinafter "Defendant GDPM"), seeks to receive all written communications from Defendant GDPM regarding this crucial program in a format that is accessible to her and her unique needs.  Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and the Fair Housing Amendments Act require Defendant GDPM to communicate effectively with Ms. Jordan.

Because of her vision disability, Ms. Jordan cannot read anything in writing, and has therefore requested audio recordings of written communications from Defendant GDPM so she can receive and maintain the same information that all other participants in the Voucher Program receive.  Currently, however, Defendant GDPM is only providing Ms. Jordan all materials in writing, which cannot be read by her, and this threatens her continued participation in this program.  Ms. Jordan, who has very limited income, relies on the Section 8 Voucher program to pay for her housing, and her termination from this program, particularly because of her disabilities and her medical needs, would have harmful consequences, including homelessness. Ms. Jordan requires this Court's immediate intervention to protect her from irreparable harm.[1]

The predominant issue in this case is whether Defendant GDPM has a legitimate defense that, despite its substantial budget and sizable federal funding, communicating with Ms. Jordan effectively would be too much of an administrative and financial burden.  But this case involves much broader issues as well, including the rights of people with disabilities to be fully integrated

---

[1] Ms. Jordan previously filed a memorandum in support of her motion for preliminary injunction (Docs. 1-1.3) and a reply memorandum in support (Doc. 8), which she incorporates in this post-hearing brief.

in our communities, to have equal access and opportunities to participate in critical government programs, and, specifically for people who are blind or have a vision disability, to be able to receive information in an effective and accessible format.

## II.     STATEMENT OF FACTS

Ms. Jordan has been cortically blind since 1988 as a result of trauma from an automobile accident.  (Plaintiff's Exhibit 3, Tr. 16).  According to her neuro-ophthalmologist, Dr. Walter C. Hartel, M.D., whom she has visited at least once annually since June 1995, she "has no light perception from either eye," cannot read, and "currently lives in total darkness."  (Plaintiff's Exhibit 2, Tr. 16).  Some assistive technology, for example text magnification, provides her no benefit (Tr. 18), and she cannot read or utilize Braille.  (Tr. 21).  Ms. Jordan has submitted multiple "Certificates of Blindness" to Defendant GDPM over the years.  (Tr. 25-27; Plaintiff's Exhibits 4, 5).

Due to her disabilities and limited income, she participates in the Section 8 Voucher Program, a federal program in which the United States Department of Housing and Urban Development (hereinafter "HUD") pays rental subsidies to private landlords who agree to participate in the program.  See 42 U.S.C. § 1437(a), *et seq.*; 24 C.F.R. part 982.  This program enables eligible, low-income individuals to afford decent, safe, and sanitary housing.  *Id.*

Defendant GDPM has administered the Voucher Program in Montgomery County since October 26, 2011.  As part of this program, it issues to any eligible individual a voucher along with written communications, which then require responses in order to ensure his or her continued participation in the program.  These documents include request for tenancy approval (hereinafter "RTA") packets, housing assistance payments (hereinafter "HAP") contracts, lease appointment notifications, notifications of housing quality standards inspections, recertification

appointment notifications, rent change notifications, requests for family income and composition information, and notices of proposed termination from the program and administrative due process rights. A participant's failure to comply with his or her obligations under this program is grounds for termination.

The Voucher Program is absolutely essential to Ms. Jordan. The program covers all of her rent, which she would not be able to afford otherwise because of her limited income and disabilities. (Tr. 40). Without this program, she would not have a place to live. (Tr. 40). She has been homeless in the past and, if this occurred again, would cause her great harm:

> I'm quite sure I would have illnesses as I did when I was previously homeless. I had medication to spoil. I'm diabetic. Insulin can't be refrigerated. In this type of weather, Insulin would freeze. [Homelessness presented] [u]nique challenges, I didn't cope well. I've ended up in emergency rooms. I've ended up with my throat cut. I've ended up losing possessions.

(Tr. 40).

Ms. Jordan moved from Greene County, Ohio to the Dayton area in 2003. (Tr. 29). At that time, staff at Defendant Dayton Metropolitan Housing Authority (hereinafter "Defendant "DMHA"), the precursor to Defendant GDPM which administered the Voucher Program at the time, had asked her to sign several documents or forms, even though she could not see them to read and, therefore, did not know what they were. Even if Ms. Jordan is verbally given information regarding her Section 8 voucher, she understandably cannot remember everything she is told, and therefore requires a record of the information provided to her, just as a person without a visual impairment would have a written record. (Tr. 30). Without audio tapes, Ms. Jordan cannot recall program information, where as a participant with no vision disability could easily save written communications to refer to at a later date. (Tr. 36). Ms. Jordan therefore requested that she receive audio recordings of future written communications. (Tr. 29).

3

In 2003, when Ms. Jordan began her participation in the Voucher Program administered by then DMHA, she requested audio tapes of all written communications. (Tr. 29). Over the years, Ms. Jordan has renewed this request numerous times, as the only format that is truly accessible to her, as a reasonable accommodation for her visual disability. (Plaintiff's Exhibits 9, 17). For example, between 2005 and 2007 HUD reminded DMHA of Ms. Jordan's request and the PHA's obligation under Section 504 to ensure effective communication and entered into a Voluntary Compliance Agreement. (Plaintiff's Exhibit 9). In 2009, Ohio Legal Rights Service contacted DMHA on behalf of Ms. Jordan since she received written communications from DMHA without audio tapes. (Plaintiff's Exhibit 17). In response, DMHA agreed to provide audio tapes of written communications to Ms. Jordan in the future. (Plaintiff's Exhibit 18). Most recently, on February 20, 2013, Ms. Jordan, through her legal counsel, renewed her request for written communications from Defendant GDPM to her be provided through audio recordings. (Plaintiff's Exhibit 24).

Defendants have only sporadically complied with this request (Tr. 32), however, and Defendant GDPM, as the parties have stipulated, has not sent Ms. Jordan any audio recordings since October 2012. (Doc. 20). Instead, GDPM now provides everything to her in writing, even one-page notices that would require little effort to produce in an accessible format. (Doc. 20).

Defendant GDPM continues to shift financial responsibility for all communications regarding the Voucher Program to Ms. Jordan, despite its legal obligations and the enormous disparity in resources. Ms. Jordan lives on a limited income of approximately $700 a month. (Tr. 27). She is also dependent on third parties to read her mail at a cost of $18 an hour. (Tr. 30). Ms. Jordan can only afford $36 a month for a reader's service. (Tr. 30). With her limited income, Ms. Jordan cannot afford to pay a reader to read all of her mail. (Tr. 30). GDPM has taken a position

that not only evades its legal responsibilities, but has also put Ms. Jordan in a situation where she is unaware of important information sent to her in written form.

Defendant GDPM receives federal funds from HUD to administer its Voucher Program, and its budget for this program is approximately $20 million, made up of Housing Assistance Payments (hereinafter "HAP") funds, which are paid directly to private landlords as part of the program, and Administrative Fee funds. (Tr. 115-116). The HAP monies are approximately $18 million per year, while the Administrative Fees have fluctuated over the years. (Tr. 255, 259-260). In 2011, GDPM received approximately $160,000 each month in Administrative Fees, and in the years 2012 and 2013, GDPM received approximately $150,000 each month in Administrative Fees. (Tr. 260). Importantly, Defendant GDPM has additional Administrative Fees held in reserve, which is funding received from HUD but unaccounted for in Defendant GDPM's budget (Tr. 261) and which is a requirement under a HUD regulation. 24 C.F.R. 982.155. On June 30, 2013, GDPM had an Administrative Fee reserve between $5,000 and $6,000. (Tr. 262).

## III.    STANDARD OF REVIEW

"The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *United Food & Commer. Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998) (citing *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978)). In the Sixth Circuit, when courts determine whether to grant a preliminary injunction, "the focus always must be on prevention of injury by a proper order." *Id.* Thus, "if the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury." *Id.*

5

In deciding whether to grant injunctive relief prior to trial, this Court must consider four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury if the court does not grant a preliminary injunction; (3) whether the preliminary injunction would cause substantial harm to others; and (4) whether a preliminary injunction would be in the public interest. *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000). These four considerations are "factors to be balanced, not prerequisites that must be met." *Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001) (citing *Six Clinics Holding Corp., II v. Cafcomp Systems*, 119 F.3d 393, 400 (6th Cir.1997)).

## IV. LEGAL ARGUMENT

### A. Ms. Jordan has proven a strong likelihood of success on the merits of her claims against Defendants under Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and the Fair Housing Amendments Act.

In her Complaint, Ms. Jordan has alleged that Defendant GDPM has violated, and continues to violate her rights under Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and the Fair Housing Amendments Act by failing to communicate with her effectively, by failing to reasonably accommodate her disability, and failing to ensure her equal access to the Section 8 Voucher program. Notably, prior to the preliminary injunction hearing, the parties stipulated that Ms. Jordan is a person with a disability (or "handicap") within the meaning of these federal laws, that Defendant GDPM is a recipient of federal funding and that GDPM has not sent Ms. Jordan any audio recordings since October 2012. (Doc. 20). Ms. Jordan has demonstrated a strong likelihood of success on each of her federal claims, as explained below.

**1.    Defendant GDPM has violated Ms. Jordan's rights under Title II of the ADA by refusing her request for reasonable accommodations for her disability, by failing to communicate effectively with her, and by failing to ensure her equal access to the Voucher Program which it administers.**

In enacting the Americans with Disabilities Act ("ADA"), Congress expressly found that "physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination." 42 U.S.C. § 12101(a)(1). Particularly in the context of housing and access to public services, "individuals with disabilities continually encounter various forms of discrimination, including … the discriminatory effects of … communication barriers [and a] failure to make modifications to existing … practices." 42 U.S.C. § 12101(a)(3), (5). People with disabilities, "as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally," and therefore such individuals should be assured "equality of opportunity, full participation, independent living, and economic self-sufficiency." 42 U.S.C. § 12101(a)(6)-(7).

Title II of the ADA prohibits public entities from discriminating against a qualified person with a disability or from excluding him or her from participation in, or denying the benefits of, its services, programs, or activities on the basis of such disability. 42 U.S.C. § 12132. To prevail on a claim under the ADA, Ms. Jordan must establish that "(1) she has a disability; (2) she is otherwise qualified; and (3) she is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely because of her disability." *Dillery v. City of Sandusky*, 398 F.3d 562, 567 (6th Cir. 2005) (citing *Jones v. City of Monroe*, 341 F.3d 474, 477 (6th Cir. 2003)).

In its Answer, Defendant GDPM conceded that it is a public entity. (Doc. 7, ¶ 26). Also, as stated above, the parties have stipulated that Ms. Jordan has a disability within the meaning of

7

the ADA.  (Doc. 20).  Ms. Jordan is indisputably "otherwise qualified" to participate in the Section 8 Voucher program because she, "with or without reasonable modifications to rules, policies, or practices … or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in" this program administered by Defendant GDPM.  42 U.S.C. § 12131; (Tr. 175).

Finally, Ms. Jordan has demonstrated that Defendant GDPM has discriminated against her on the basis of her disability and denied her equal access to the Voucher Program by denying her request for reasonable accommodations for her disability and by failing to communicate effectively with her.  Title II of the ADA requires that a public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).  Failing to make such reasonable modifications is discrimination. *Olmstead v. L.C.*, 527 U.S. 581, 601, (1999) (holding that a public entity's failure to reasonably accommodate a person with a disability is a form of disability discrimination under Title II of the ADA); *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 461 (6th Cir.1997) (holding that, to prove discrimination based on a failure to make a reasonable accommodation under Title II of the ADA, a plaintiff must show that the public entity "could have reasonably accommodated [her] and refused to do so").

Moreover, as a public entity, Defendant GDPM must "take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others."  28 C.F.R. § 35.160(a)(1); *see also Seremeth v. Bd. of County Commissioners Frederick County*, 673 F.3d 333, 337 (4th Cir. 2012)

(holding that a public entity's failure to communicate effectively with people with disabilities is a form of discrimination under Title II of the ADA). This legal obligation requires Defendant GDPM to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1).

> Under 28 C.F.R. § 35.104, "auxiliary aids and services" include:
>
> Qualified readers; taped texts; <u>audio recordings</u>; Brailled materials and displays; screen reader software; magnification software; optical readers; secondary auditory programs (SAP); large print materials; accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision; [a]cquisition or modification of equipment or devices; and [o]ther similar services and actions. (emphasis added).

Also, "[t]he type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. § 35.160(b)(2). In determining the type of auxiliary aid or service, GDPM must "give primary consideration" to Ms. Jordan's request. *Id.* Also, "[i]n order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." *Id.*

Both the law and GDPM's own policies make clear that Ms. Jordan's request for audio recordings is reasonable. Audio recordings are explicitly mentioned as an auxiliary aid or service under Title II of the ADA. Additionally, Defendant GDPM's own "effective communications policy," which, like federal law, is meant to "ensure that communications with

program participants … with disabilities are as effective as communications with others," requires it to provide auxiliary aids and services to individuals with visual disabilities to afford equal access to its programs. (Plaintiff's Exhibit 8). Under this policy, auxiliary aids and services include "qualified readers, taped texts, <u>audio recordings</u>, Brailled materials, large print materials, or other effective methods of making visually delivered material available to individuals with visual impairments." (*Id.* (emphasis added)). Indeed, Defendant GDPM's own "reasonable accommodations request form" includes "a request for audio tapes of any notices, etc." as an option. (Defendant's Exhibit B11.) Defendant GDPM's website also proposes providing materials on tape as a means of effective communication to participants with visual impairments.[2]

Because of her vision disability, audio recordings are the only accessible and effective format in which Ms. Jordan can access and maintain the information she needs to continue her participation in the Voucher Program. According to Dr. Hartel, her neuro-ophthalmologist, she "has no light perception from either eye," cannot read, and "currently lives in total darkness." (Plaintiff's Exhibit 2). Furthermore, Ms. Jordan testified that assistive technology, for example, text magnification, provides her no benefit and that she cannot read or utilize Braille. (Tr. 18, 21). Similarly, large print materials are not an effective manner of communication either. Audio recordings are the only effective format for Ms. Jordan, and under the law, GDPM must give primary consideration to her requested format.[3]

---

[2] Greater Dayton Premier Management, Section 504—Frequently Asked Questions, http://www.gdpm.org/about-dmha/agency-performance/section-504.html (last visited July 15, 2013).

[3] The United States Department of Justice, which enforces Title II of the ADA, has issued a technical assistance manual to guide public entities in complying with this federal law. "For individuals with vision impairments, appropriate auxiliary aids include readers, audio recordings, Brailled materials, and large print materials. Brailled materials, however, are ineffective for many individuals with vision impairments who do not read Braille, just as large print materials would be ineffective for individuals with severely impaired vision who rely on Braille or on audio communications. Thus, the requirement for consultation and primary consideration to the individual's

Defendant GDPM peculiarly argues that it is not required to provide individualized information to Ms. Jordan (e.g. correspondence, notices, inspection reports, recertification materials, and all other documents provided to all program participants) in an accessible format, only general information about the Voucher Program (e.g. brochures or other general information on the Voucher Program available to everybody). (Tr. 303). The basis for this argument, according to Defendant GDPM, is 28 C.F.R. § 35.135, which provides that a public entity is not required "to provide to individuals with disabilities personal devices, such as wheelchairs; individually prescribed devices, such as prescription eyeglasses or hearing aids; readers for personal use or study; or services of a personal nature including assistance in eating, toileting, or dressing."

Defendant GDPM provides no legal or logical support for its interpretation that providing audio recordings of communications directed to Ms. Jordan would be a personal device. Indeed, such an interpretation would completely eviscerate its obligation under 28 C.F.R. § 35.160(a)(1) to ensure that communications with Voucher Program participants with disabilities "are as effective as communications with others." An "audio recording" is an "auxiliary aid" under 28 C.F.R. § 35.104; it is simply not a personal device or individually prescribed device (like a wheelchair or hearing aid) that Ms. Jordan would be able to use for her own personal needs or for purposes other than the Voucher Program.

Furthermore, neither Defendant GDPM's "effective communications policy" nor its "reasonable accommodations policy" make this distinction that GDPM now claims. (Plaintiff's Exhibits 7, 8). Indeed, the latter policy states that its "policies and practices will be designed to provide assurances that persons with disabilities will be given reasonable accommodations, upon

---

expressed choice applies to information provided in visual formats as well as to aurally communicated information." See http://www.ada.gov/taman2.html#II-7.0000 (II-7.1100 Primary consideration).

request, so that they may fully access and utilize the housing program and related services," and importantly "is applicable to *all situations* described in this Administrative Plan." (Plaintiff's Exhibit 7 (emphasis added)). Defendant GDPM's argument that audio recordings are a "personal device" under 28 C.F.R. § 35.135 has no merit.

In sum, Ms. Jordan has demonstrated a substantial likelihood of prevailing on the merits of her claim under Title II of the ADA against Defendant GDPM. Its failure to grant her request for reasonable accommodations for her disability and to communicate effectively with her through the only format accessible to her constitutes discrimination under Title II of the ADA.

> **2. Defendant GDPM has violated Ms. Jordan's rights under Section 504 of the Rehabilitation Act of 1973 by refusing her request for reasonable accommodations for her disability, by failing to communicate effectively with her, and by failing to ensure her equal access to the Voucher Program which it administers.**

Section 504 of the Rehabilitation Act of 1973 ("Section 504") prohibits a recipient of federal funding from excluding a qualified person with a disability from, or denying the benefits of, its programs or activities or otherwise subjecting him or her to discrimination, solely on the basis of his or her disability. 29 U.S.C. § 794(a). To prevail on a Section 504 claim, Ms. Jordan must show that "(1) [she is a person with a disability] under the Act; (2) [she] is 'otherwise qualified' for participation in the program; (3) [she] is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of [her disability]; and (4) [t]he relevant program or activity is receiving Federal financial assistance." *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 573 (6th Cir. 1988).

Defendant GDPM's legal obligations under Section 504 are virtually identical to those under Title II of the ADA, and Plaintiff incorporates her arguments in the above section as also relevant here. Like the ADA, Section 504 offers "the same guarantee that a covered entity, such

as [GDPM], must provide reasonable accommodations in order to make the entity's benefits and programs accessible to people with disabilities."  *Super v. J. D'Amelia & Assocs., LLC*, 2010 WL 3926887 at *3 (D.Conn. Sept. 30, 2010); *see also Alexander v. Choate*, 469 U.S. 287, 295 (1985) (holding that a failure by a recipient of federal funding to accommodate a person with a disability is a form of disability discrimination under Section 504); *McNamara v. Ohio Building Authority*, 697 F.Supp.2d 820 (N.D. Ohio 2010) (stating that a plaintiff who alleges that a recipient of federal funding failed to reasonably accommodate her disability under Section 504 must show that it reasonably could have but failed to do so).

Furthermore, under Section 504, similar to the ADA, a recipient of federal funding must "take appropriate steps to ensure effective communication with applicants, beneficiaries, and members of the public."  24 C.F.R. § 8.6(a).   It must "furnish appropriate auxiliary aids where necessary to afford an individual with [a disability] an equal opportunity to participate in, and enjoy the benefits of, a program or activity receiving Federal financial assistance," and in determining what auxiliary aids are necessary, it must "give primary consideration to the requests of the individual with [a disability]."  24 C.F.R. § 8.6(a)(1).

In relevant part, 24 CFR § 8.3 defines "auxiliary aids" as

services or devices that enable persons with impaired sensory … skills to have an equal opportunity to participate in, and enjoy the benefits of, programs or activities receiving Federal financial assistance.  For example, auxiliary aids for persons with impaired vision may include readers, Brailled materials, <u>audio recordings</u>, and other similar services and devices.  (emphasis added)

Again, the parties have stipulated that Ms. Jordan is a person with a disability under Section 504 and that Defendant GDPM is a recipient of federal funding.  (Doc. 20).  It is further undisputed that Ms. Jordan is an "otherwise qualified" person with a disability, as demonstrated by her current and continued eligibility for the Voucher Program.   Defendant GDPM's failure to

13

grant Ms. Jordan's request for accommodations for her disability and its refusal to communicate effectively with her in an accessible format constitutes unlawful discrimination under Section 504. Her request for audio recordings has always been reasonable, as this specific format is included within the definition of "auxiliary aids and services" under Section 504 and Defendant GDPM's "effective communication policy" and is included as an option on Defendant GDPM's "reasonable accommodation form" and on its website.[4]

Importantly, Defendant GDPM is bound by a Voluntary Compliance Agreement ("VCA") dated September 25, 2006 between HUD and its predecessor, Defendant DMHA, to provide to Ms. Jordan audio recordings of written correspondence and to "maintain documentation of written correspondence and accompanying audiotapes sent to" Ms. Jordan. (Plaintiff's Exhibit 9). The VCA is HUD's official position with regard to Ms. Jordan's reasonable accommodation request. This VCA was the result of an investigation into whether Defendant DMHA was violating Ms. Jordan's rights under Section 504, and failure to comply could result "in the suspension or termination of, or refusal to grant or to continue Federal financial assistance, or other actions authorized by law." *Id.* In fact, since the preliminary injunction hearing, HUD issued a Letter of Findings of Non-Compliance, finding GDPM/DMHA refused to adhere to the terms of the VCA. (Attachment 1, January 24, 2014 Letter of Findings of Non-Compliance from HUD to GDPM).[5]

---

[4] Similar to Title II of the ADA, a regulation implementing Section 504 states that "[t]he recipient is not required to provide individually prescribed devices, readers for personal use or study, or other devices of a personal nature." 24 C.F.R. § 8.6(a)(1)(ii). As argued above, this regulation cannot possibly support Defendant GDPM's contention that it is required only to provide general information to Ms. Jordan in an accessible format, and not specific information relating to her case. An audio recording is an "auxiliary aid or service" under 24 CFR § 8.3 and she could not use such audio recordings for her own personal use unrelated to her participation in the Section 8 Voucher program.

[5] This Court should take judicial notice of this government record. See Fed. R. Evid. 201(b)(2) (stating that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); see also *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 630 F.Supp. 842, 849 (S.D. Ohio 2007) (concluding that public records and government documents are generally considered "not to be subject to reasonable dispute.").

Ms. Jordan has demonstrated a substantial likelihood of success on the merits of her claim under Section 504 against Defendant GDPM.

> **3.      Defendant GDPM has violated Ms. Jordan's rights under the Fair Housing Amendments Act by refusing her request for reasonable accommodations for her disability and by failing to communicate effectively with her.**

The Fair Housing Amendments Act (FHAA) prohibits discrimination on the basis of one's disability.  42 U.S.C. § 3604(f).  This federal law makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling," on the basis of an individual's disability."  42 U.S.C. § 3604(f)(2).  "[A] refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling," constitutes discrimination under the FHAA.  42 U.S.C. § 3604(f)(3)(B).

To prevail on a claim that Defendant GDPM failed to make needed reasonable accommodations for her under the FHAA, Ms. Jordan must prove

> (1) [she has a disability] within the meaning of 42 U.S.C. § 3602(h); (2) that the defendant knew or should reasonably be expected to know of [her disability]; (3) that accommodation of [her disability] may be necessary to afford [her] an equal opportunity to use and enjoy the dwelling; (4) that the accommodation is reasonable; and (5) that the defendant refused to make the requested accommodation.

*Overlook Mut. Homes, Inc. v. Spencer*, 666 F.Supp.2d 850, 855 (S.D. Ohio 2009).

Under the FHAA, Defendant GDPM must also "take appropriate steps to ensure effective communication" with participants in its programs.  24 C.F.R. § 9.160(a).  It must "furnish appropriate auxiliary aids where necessary to afford an individual with disabilities an equal opportunity to participate in, and enjoy the benefits of, a program or activity" it conducts.  24

C.F.R. § 9.160(a)(1). "In determining what type of auxiliary aid is necessary, the agency shall give primary consideration to the requests of the individual with disabilities." 24 C.F.R. § 9.160(a)(1)(i).

24 C.F.R. § 9.103 defines "auxiliary aids" as

> services or devices that enable persons with impaired sensory, manual, or communication skills to have an equal opportunity to participate in, and enjoy the benefits of, programs or activities conducted by the agency. For example, auxiliary aids useful for persons with impaired vision include readers, Brailled materials, <u>audio recordings</u>, and other similar services and devices. (emphasis added)

As noted above, the parties have stipulated that Ms. Jordan is a person with a disability under the FHAA. (Doc. 20). Defendant GDPM undoubtedly has known that Ms. Jordan has a vision disability: She has submitted several "Certificates of Blindness" to Defendant GDPM; she and her legal counsel have repeatedly renewed her request for audio recordings of all written communications as a reasonable accommodation for her vision disability; GDPM is a party to a VCA with HUD dealing directly with Ms. Jordan's disability; and Defendant GDPM has impliedly acknowledged she has a vision disability by complying with this request in the past, albeit only sporadically.

Ms. Jordan's request for audio recordings in lieu of written communications from Defendant GDPM as an accommodation for her disability is reasonable, particularly in light of the fact this specific format is included within the definition of "auxiliary aids" under both 24 C.F.R. § 9.103[6] and Defendant GDPM's "effective communication policy" and is included as an option on Defendant GDPM's "reasonable accommodation form" and on its website.

---

[6] Similar to Title II of the ADA, a regulation implementing Section 504 states that "[t]he recipient is not required to provide individually prescribed devices, readers for personal use or study, or other devices of a personal nature." 24 C.F.R. § 8.6(a)(1)(ii). As argued above, this regulation cannot possibly support Defendant GDPM's contention that it is required only to provide general information to Ms. Jordan in an accessible format, and not specific information relating to her case. An audio recording is an "auxiliary aid or service" under 24 CFR § 8.3 and she could not use such audio recordings for her own personal use unrelated to her participation in the Voucher Program.

Furthermore, Ms. Jordan's reasonable accommodation request is necessary to afford her an equal opportunity to use and enjoy her dwelling. Audio recordings are the only format accessible to her. (Tr. 29-31). Defendant GDPM's current decision to provide Ms. Jordan materials only in writing means that she is unable to access information essential to her continued participation in the Voucher Program. Ms. Jordan is therefore at significant risk of failing to comply with her obligations as a participant in the program, which would be a basis for termination from the program. She cannot afford to pay rent in the absence of this program, which means an eviction action from her private landlord is virtually certain.

   **4.   Defendant GDPM has failed to prove that granting Ms. Jordan's reasonable accommodation request and communicating effectively with her is an undue financial and administrative burden.**

Under Title II of the ADA, Section 504, and the FHAA, Defendant GDPM can only defend its failure to accommodate Ms. Jordan's vision disability by demonstrating that her requests for audio recordings as a means of communication constitute an undue financial and administrative burden or result in a fundamental alteration of its program. See 28 C.F.R. § 35.130(b)(7); *Smith & Lee Associates, Inc. v. City of Taylor, Michigan*, 102 F.3d 781, 795 (6th Cir. 1996). Defendant GDPM has only asserted the former as a defense in this action.[7]

But Defendant GDPM has failed to demonstrate an undue administrative or financial burden imposed upon it by reasonably accommodating Ms. Jordan and communicating effectively with her. In light of its sizable budget and the substantial amount of funding it receives from HUD, the cost to Defendant GDPM to accommodate Ms. Jordan would be minimal. Its annual budget is $36 million, $20 million of which is for administration of its Voucher Program. (Tr. 255, 259-

---

[7] While Title II of the ADA contains no reference to undue financial and administrative burden as a defense, Ms. Jordan will address the affirmative defense raised by Defendants.

60). Approximately $18 million of this amount is used for HAP payments to private landlords under the Voucher Program; in addition, Defendant GDPM receives funding through Administrative Fees. (Tr. 255, 259-60). In 2011, GDPM received approximately $160,000 each month in Administrative Fees, and in the years 2012 and 2013, GDPM received approximately $150,000 each month in Administrative Fees. (Tr. 260). This amounts to just under $2 million per year in Administrative Fees. Importantly, Defendant GDPM has additional Administrative Fees held in reserve, which is funding received from HUD but unaccounted for in Defendant GDPM's budget (Tr. 261) and which is a requirement of a HUD regulation. 24 C.F.R. 982.155. On June 30, 2013, GDPM had an Administrative Fee reserve between $5,000 and $6,000. (Tr. 262).

At the hearing, Defendant GDPM presented testimony through Elaine Letton, Senior Manager of the Voucher Program, that providing audio recordings to Ms. Jordan as a form of communication would cost it between $1,400 and $1,600 per year. (Tr. 213). This figure is derived from GDPM's contention that it would take 100 hours a year to read the 29 documents in Defendant's Exhibits B1-B29 and an additional 7-8 documents (Tr. 165-166, 208). Notably, this figure cited by Defendant GDPM amounts to only 8 hours per month. According to GDPM, staff who would produce the audio recordings are paid between $14 and $16 an hour plus benefits. (Tr. 213).[8]

The hours and costs put forth by GDPM cannot withstand close scrutiny. Exhibits B1-B29 are a total of 126 pages.[9] During the hearing, Ms. Letton read out loud Plaintiff's Exhibit 136, a

---

[8] Defendant GDPM also employs temporary workers at a lower rate of $10 per hour and no benefits that it could utilize to produce the recordings. While GDPM claims it cannot do so, it did not provide a sufficient justification why it has refused to utilize a temporary worker to produce audio recordings for Ms. Jordan. (Tr. 172).

[9] 1 is 8 pages; B2 is 4 pages; B3 is 1 page; B4 is 1 page; B5 is 43 pages; B6 is 1 page; B7 is 6 pages; B8 is 1 page; B9 is 3 pages; B10 is 1 page; B11 is 1 page; B12 is 1 page; B13 is 1 page; B14 is 1 page; B15 is 1 page; B16 is 1 page; B17 is 10 pages; B 18 is 1 page; B19 is 2 pages; B20 is 20 pages; B21 is 1 page; B22 is 2 pages; B23 is 5 pages; B24 is 2 pages; B25 is 1 page; B26 is 2 pages; B27 is 1 page; B28 is 3 pages; and B29 is 1 page.

one-page notice, as if reading into audio recording device, and it took her 2 minutes and 21.82 seconds to do so.  (Tr. 210-13).   Even rounding up to 3 minutes to read one page, 126 pages multiplied by 3 minutes equals 378 minutes, which is 6.3 hours per year, an amount significantly lower than GDPM's estimate of 100 hours per year.  The yearly cost of reading 126 pages of documents onto audio tape is approximately $100.80 based on GDPM's hourly rate of $16 an hour.  The true financial cost is significantly less than GDPM's proposed figure.

Even if this court finds Defendant GDPM's 100 hours of staff time a year at $16 an hour credible, $1,600 a year is only fraction of its budget – .0052% of the entire GDPM $36 million budget, .008% of the Voucher Program's nearly $20 million budget and .089% of the approximate $1.8 million Administrative Fees in 2012 and 2013.[10]

Importantly, Defendant GDPM denied Ms. Jordan's reasonable accommodation request without first determining the now claimed administrative and financial cost.  Once Ms. Jordan filed this lawsuit, GDPM was still unable to provide figures showing the actual administrative and financial cost of implementing the accommodation.   (Attachment 2, Elaine Letton Deposition at 90-97).  Indeed, it was only at the hearing that Defendant GDPM first disclosed the financial cost and administrative time.  GDPM did not calculate specifically how much time it took to produce audio recordings (Tr. 197), nor did it calculate the 100-hour number until after Ms. Jordan's reasonable accommodation request had been made and denied.  (Tr. 198-199).  Ms. Letton, who is responsible for running the Voucher Program budget and who makes decision

---

[10] It is the U.S. Department of Justice position that, under the ADA, "compliance with § 35.150(a), like compliance with the corresponding provisions of the section 504 regulations for federally conducted programs, would in most cases not result in undue financial and administrative burdens on a public entity. In determining whether financial and administrative burdens are undue, all public entity resources available for use in the funding and operation of the service, program, or activity should be considered." 28 C.F.R. Pt. 35, App. B, Section 35.150 Existing Facilities.

about what is included in the budget, has never budgeted Ms. Jordan's reasonable accommodation into the annual budget. (Tr. 262; Attachment 3, Stevens Deposition at 57-59).

Instead, when making the decision not to provide Ms. Jordan with audio recordings, Christopher Green, Defendant GDPM's Section 504 Coordinator and General Counsel, relied upon the opinion of a Linda Sanford, a junior HUD employee who lacked authority to speak for HUD on this matter, to tell him that Ms. Jordan's request was unreasonable. (Tr. 276-277; Declaration of Maurice McGough; Doc. 15-1). Even if Ms. Sanford's opinion carried any official weight, it is silent as to whether Ms. Jordan's accommodation request is an undue financial burden as it only speaks to whether the request is an undue administrative burden. (Tr. 277; Defendant's Exhibit E, page 2 "I believe the accommodation you identified … falls into this category – undue administrative burden.") Moreover, this opinion was based solely on information provided only by Mr. Green, not both parties. (Tr. 276).

Importantly, in his role as 504 Coordinator for GDPM, Mr. Green had no knowledge of a Section 504 Voluntary Compliance Agreement his agency signed with HUD in 2006. (Tr. 273). But someone at GDPM should have had knowledge of this VCA as it is not only in Ms. Jordan's tenant file (Defendant's Exhibit A3, page 30; Tr. 206), but it deals directly with complying with important civil rights statutes. Had that VCA been consulted, Mr. Green would have known what HUD's official position on this issue was and how to proceed if he wished to challenge that official position. (Plaintiff's Exhibit 9 at 4). The financial and administrative burden defense put forth by GDPM is without merit. When Mr. Green made the decision to cease providing Ms. Jordan audio recordings, he did not have any specific information on the amount of time it took staff to produce these audio recordings or the financial impact it imposed on GDPM. (Tr. 314).

For example, Mr. Green did not consult GDPM Budget Manager Darren Stephens to determine the actual financial cost to GDPM.  (Tr. 261).[11]

Even considering the calculation presented at the hearing by GDPM, the administrative requirement and the cost for implementing Ms. Jordan's reasonable accommodation request are minimal when compared to GDPM's resources.

### B.    Ms. Jordan will suffer irreparable injury if this Court does not grant a preliminary injunction.

The second factor in determining whether to grant preliminary relief is the likelihood that the plaintiff will experience irreparable injury in the absence of such relief.  *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 8 (2008).  In this case, irreparable harm can be established in two ways.  First, as explained below, irreparable harm should be presumed in this case because it involves housing discrimination and because the federal laws underlying Ms. Jordan's claims permit equitable relief to remedy a violation.  Second, Ms. Jordan has demonstrated that she will experience actual irreparable harm if this Court does not grant her preliminary relief, since she likely loses her voucher resulting in homelessness.

In the particular context of housing discrimination, this Court has concluded that "the traditional showing of irreparable harm is not required in order to grant a preliminary injunction in a Fair Housing Act case."  *Cousins v. Bray*, 297 F.Supp. 2d 1027, 1041 (S.D. Ohio 2003) (citing *Epicenter of Steubenville, Inc. v. City of Steubenville*, 924 F.Supp. 845, 852 (S.D. Ohio 1996)).  Because of the "strong national policy" against discrimination in housing, "once a plaintiff has demonstrated a likelihood of success on the merits of a claim of housing

---

[11] At the hearing, the Budget Manager gave his opinion that if GDPM had to spend one dollar on granting Ms. Jordan's request for audio recordings, this would be an undue financial burden.  (Tr. 261).  This view is clearly not in compliance with the law.

discrimination, irreparable harm will be presumed." *Id.*; *see also Chapp v. Bowman*, 750 F. Supp. 274 (W.D. Mich. 1990) (quoting *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984)) (holding that when "housing discrimination is shown, 'it is reasonable to presume that irreparable injury flows from the discrimination'").

Additionally, irreparable harm is similarly presumed where a federal statute permits equitable relief to remedy a violation. *Cousins*, 297 F.Supp.2d at 1041. In this case, the FHAA specifically provides for injunctive relief as a remedy. 42 U.S.C. § 3614. The ADA and Section 504 also incorporate remedial statutes that include injunctive relief as a remedy. The ADA imports a remedy originally established for violations of the Civil Rights Act and allows for injunctive relief. 42 U.S.C. § 2003a-3. Section 504 similarly provides for injunctive relief when intentional discrimination occurs. 29 U.S.C. § 794a; 42 U.S.C. § 2000e-5(g)(1); *see also Kennerly v. ARO, Inc.*, 447 F. Supp. 1090, 1100 (E.D. Tenn. 1977) (concluding that an act is intentional for the purposes of this remedy when it is "not accidental, inadvertent, or heedless") (citing *Waters v. Wisconsin Steel Works of Int'l. Harvester Co.*, 502 F.2d 1309 (7th Cir. 1974)).

Regardless of any legal presumption, Ms. Jordan will likely experience actual irreparable harm in the absence of a preliminary injunction since her housing is at risk. (Tr. 40). Without this Court's immediate intervention, she will only receive written communications that she cannot read, causing her to be at significant risk of termination from the Voucher Program. Indeed, a failure to comply with her obligations under the Voucher Program would constitute a violation of 24 C.F.R. § 982.551 and would be the basis for termination from the program.[12] (Tr. 190).

---

[12] For example, notifications of recertification appointments can be sent at any time, as the appointments are scheduled annually but may also occur intermittently throughout the year based on fluctuations in income and household size. See U. S. Dep't of Hous. And Urban Dev., Housing Choice Voucher Guidebook http://portal.hud.gov/hudportal/documents/huddoc?id=DOC_35622.pdf.

According to GDPM, if a public housing authority proposes termination from the program, it will send a one-page written notice, including information about due process rights, to the program participant. (Tr. 190-92). The individual will then have ten days to request a hearing, but if he or she fails to do so, "the termination stands and they are removed from the program and not eligible for three years." (Tr. 191). Kindra Wood Campbell, the current team leader at Defendant GDPM for its Voucher Program, testified that Ms. Jordan could have been terminated from the program based on alleged violations of rules. (Tr. 250). This could easily occur again in the future, especially since Ms. Jordan is only receiving materials in writing.

Ms. Jordan's continued participation in the Voucher Program is critical to ensuring she has a place to live. She could not afford rent without the rent subsidies through this program, and her termination from the program would almost certainly result in homelessness. (Tr. 40). In fact, as she testified, past homelessness had serious impacts on her health and safety.

> I'm quite sure I would have illnesses as I did when I was previously homeless. I had medication to spoil. I'm diabetic. Insulin can't be refrigerated. In this type of weather, Insulin would freeze. [Homelessness presented] [u]nique challenges, I didn't cope well. I've ended up in emergency rooms. I've ended up with my throat cut. I've ended up losing possessions."

(Tr. 40).

A plaintiff's harm from the denial of a preliminary injunction is irreparable if "it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). In this context, the loss of housing is an irreparable injury incapable of adequate compensation because a person who loses housing "cannot remain in limbo while the court resolves the matter. He or she must find housing elsewhere, and once

that housing is found . . . it becomes difficult to disrupt new friendships and other community ties by uprooting oneself again." *Chapp v. Bowman*, 750 F. Supp. 274, 277 (W.D. Mich. 1990).

Also, Defendant GDPM's ongoing discriminatory treatment of Ms. Jordan is harm in and of itself.  In *Williams v. Rhea*, a public housing authority in New York failed to provide a Voucher Program participant who was blind with materials in an accessible format, and the court rejected the housing authority's position that the participant lacked standing for declaratory and injunctive relief since he could not show a real and immediate threat of eviction or termination from the program.  2012 WL 2921211 (E.D.N.Y July 17, 2012).  Instead, the court ruled the harm the participant faced "is not the loss of his subsidy, but the agency's discriminatory treatment." *Id*. at *2.

Due to the invidiousness of housing discrimination, the availability of injunctive relief under federal law, and the real harm Ms. Jordan would face without injunctive relief, Ms. Jordan has proven that irreparable harm will very likely occur absent a preliminary injunction, and this factor also weighs in her favor.


    **C.**      **Granting Ms. Jordan the preliminary injunction will not cause substantial harm to others.**

A decision to grant Ms. Jordan's motion for preliminary injunction will not cause substantial harm to others.  GDPM will only be required to comply with the law and its own written policies.  Further, the other participants in the Voucher Program will not be at risk of termination or losing their subsidy.  Potential harm to Ms. Jordan from deferring any further actions in this case while this Court considers the merits of Ms. Jordan's claims is great.

It causes no harm to GDPM if this Court compels it to follow established federal law.  Moreover, any potential harm to GDPM is not only less than the likely harm to Ms. Jordan while

this Court considers the merits of her claim, it is significantly outweighed by the serious harm of discrimination and loss of housing Ms. Jordan faces if GDPM is not enjoined from failing to accommodate her vision disability and effectively communicate with her. Injunctive relief is required to allow Ms. Jordan equal access to the federally funded Voucher Program and prevent further injury. Therefore, the harm faced by Ms. Jordan if the preliminary injunction is denied far outweighs any harm that GDPM may suffer if the preliminary injunction is granted.

**D.    Granting Ms. Jordan the preliminary injunction is in the public interest.**

Courts in the Sixth Circuit have consistently held that "there is a significant public interest in eliminating discrimination against individuals with disabilities." *Deck v. City of Toledo*, 29 F. Supp. 2d 431, 434 (N.D. Ohio 1998) (citing *Thomas, By and Through Thomas v. Davidson Academy*, 846 F.Supp. 611, 619 (M.D. Tenn.1994)). In issuing the relief Ms. Jordan has requested, this Court will serve the public interest "by vindication of [legislative] policies" embodied in federal law. *Planned Parenthood Affiliates of Ohio v. Rhodes*, 477 F. Supp. 529, 541 (S.D. Ohio 1979).

**V.    CONCLUSION**

Based on the evidence and testimony presented to this Court at the preliminary injunction hearing, Plaintiff Jordan is entitled to a preliminary injunction to enjoin Defendant GDPM from violating her rights under the ADA, Section 504, and the FHAA. The balance of the four factors, including the substantial likelihood that she will prevail on the merits and the significant risk of irreparable harm in the absence of this Court's immediate intervention, weigh heavily in Ms. Jordan's favor.

Respectfully submitted,

/s/ Debra A. Lavey
Debra A. Lavey, #0073259
dlavey@ablelaw.org
Trial Attorney for the Plaintiff
ADVOCATES FOR BASIC LEGAL
EQUALITY, INC.
130 W. Second St., Suite 700 E.
Dayton, Ohio 45402
Phone: (937) 228-8104
Fax: (937) 535-4600

Matthew N. Currie, #0078656
mcurrie@ablelaw.org
ADVOCATES FOR BASIC LEGAL
EQUALITY, INC.
130 W. Second St., Suite 700 E.
Dayton, Ohio 45402
Phone: (937) 228-8104
Fax: (937) 535-4600

Kerstin Sjoberg-Witt, #0076405
Kevin Truitt, #0078092
ksjoberg-witt@disabilityrightsohio.org
ktruitt@disabilityrightsohio.org
DISABILITY RIGHTS OHIO
50 W. Broad St., Suite 1400
Columbus, Ohio 43215
Phone: (614) 466-7264
Fax: (937) 644-1888

Attorneys for Plaintiff Jordan

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2014, I served the forgoing *Plaintiff Renee Jordan's Post-Hearing Brief in Support of her Motion for Preliminary Injunction* with the Clerk of Courts using the CM/ECF system, which will send an electronic notification of such filing to Ray C. Freudiger, counsel for Defendant GDPM.

/s/ Debra A. Lavey
Debra A. Lavey, #0073259

26