IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

RENEE JORDAN,                          :

        Jordan,

    v.                                 :       Case No. 3:13-cv-281

GREATER DAYTON PREMIER                         JUDGE WALTER H. RICE
MANAGEMENT, *et al.*,
                                       :
        Defendants.

---

DECISION AND ENTRY RULING ON OBJECTIONS TO EXHIBITS
PRESENTED AT EVIDENTIARY HEARING; SUSTAINING PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION (DOC. #1); ORDERING
DEFENDANT GDPM TO PROVIDE COPIES OF ALL CORRESPONDENCE
ON MICROCASSETTE TAPE; SETTING STATUS CONFERENCE FOR
APRIL 10, 2014

---

       Plaintiff Renee Jordan filed a Complaint against Greater Dayton Premier

Management ("GDPM") and Dayton Metropolitan Housing Authority ("DMHA"),

alleging violations of the Fair Housing Amendments Act ("FHAA"), 42 U.S.C.

§ 3604(f)(3)(B), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29

U.S.C. § 794, and Title II of the Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12132.  Doc. #2.

       Jordan, who is blind, alleges that Defendants have discriminated against her

on the basis of her disability by failing to provide her with equal access to the

Section 8 Housing Choice Voucher Program, administered through the United

States Department of Housing and Urban Development ("HUD").  As an

accommodation for her disability, Jordan requested that Defendants provide all correspondence to her on microcassette tapes. GDPM maintains that her request constitutes an undue administrative and financial burden, and has denied her request. Jordan requests injunctive, declaratory, and monetary relief.

Along with her Complaint, Jordan filed a Motion for Preliminary Injunction, asking that, until there can be a full adjudication on the merits, GDPM be ordered to send her all correspondence on microcassette tapes. Doc. #1. After the parties conducted discovery, the Court held an evidentiary hearing on January 16, 2014, and January 23, 2014. The parties have filed post-hearing briefs, Docs. ## 30, 32, and 33, and this matter is now ripe for decision.

## I.    Background and Procedural History

Plaintiff Renee Jordan is blind. Since 2003, when she moved to Dayton, she has been a participant in HUD's Section 8 Housing Choice Voucher Program ("Voucher Program"). Tr. at 29. The Voucher Program allows eligible, low-income participants to obtain affordable housing through the issuance of vouchers. HUD pays rental subsidies to participating landlords. Local agencies receive federal financial assistance to administer the Voucher Program. Prior to October 26, 2011, the local Voucher Program was administered by the Dayton Metropolitan

2

Housing Authority ("DMHA"). Since then, it has been administered by Greater Dayton Premier Management ("GDPM").[1]

As with most government programs, participation in the Voucher Program entails quite a bit of paperwork, including, but not limited to, Request for Tenancy Approval ("RTA") packets, housing assistance payment ("HAP") contracts, housing quality standards inspection reports, and annual recertification packets. GDPM also sends participants written notification of inspection appointments, recertification appointments, and changes in rent payments. A participant who fails to keep appointments and complete the necessary paperwork in a timely manner, or otherwise fails to comply with requirements may be terminated from the Voucher Program.

As a result of her disability, Jordan cannot read written correspondence. Although she occasionally hires someone to read her mail to her, her limited income makes this difficult. Concerned that she might inadvertently miss a required appointment or a deadline for returning paperwork, thereby jeopardizing her continued participation in the Voucher Program, Jordan asked DMHA to send her copies of all correspondence on microcassette tape. In this manner, she is able to review the information on her own, and respond as needed. This also allows her to maintain a record of all correspondence, in an accessible format, in case she

---

[1]  Because DMHA is no longer in existence, the Court will subsequently refer only to GDPM, except where necessary for an accurate accounting of the background facts.

3

needs to retrieve it at a later date. In 2003, DMHA agreed to honor Jordan's request. Tr. at 27-30.

However, on numerous occasions over the next few years, attorneys representing Jordan had to remind DMHA of its obligation. In 2006, Jordan filed a complaint of discrimination with HUD, alleging that DMHA was violating Section 504 of the Rehabilitation Act by failing to provide her with microcassette tapes of all written correspondence. As a result, HUD and DMHA entered into a Voluntary Compliance Agreement ("VCA"), whereby DMHA agreed to provide Jordan with audiotapes of all written correspondence, and to maintain supporting documentation. The VCA specified that any modifications had to be in writing, approved by the Columbus FHEO Center Director, Carolyn Murphy, and signed by the party adversely affected. Pl. Ex. 9.

In late 2009 and early 2010, Jordan received at least more three letters from DMHA without audiotapes. Her attorney contacted Christopher Green, General Counsel for DMHA. Pl. Ex. 17. Green, who was hired by DMHA in 2008, testified that he was unaware of the VCA in Jordan's file. Tr. at 273. He nevertheless charged the Section 8 department head with making certain that DMHA sent all correspondence to Jordan in the format she had requested. *Id.* at 266.

The problem resurfaced in 2012, after GDPM had assumed authority for administering the Voucher Program. In February, and again in September, of that year, Debra Lavey, one of Jordan's attorneys, contacted Green about the repeated

4

failure to provide audiotapes of written correspondence. Def. Ex. G, at 1, 6. On September 26, 2012, Green responded that the latest three "letters" were probably just inspection reports. He asked, "[a]re you suggesting that we have to read all of the data contained on an inspection report to the tenant?" Lavey responded, "I am suggesting that all communication be in a format that is accessible to her and yes, in the format that she requested." *Id.* at 7-8.

Green testified that he believed that this significantly expanded the scope of Jordan's previously requested accommodation. Because of recent budget cuts, GDPM was already having trouble finding the resources to make audiotapes of all "correspondence." He believed that taping all "communications" sent to her was an undue administrative and financial burden. Tr. at 274-75. Green researched the issue and determined that federal regulations did not require GDPM to honor Jordan's request. He told Lavey that the regulations did not require GDPM to provide "readers for personal use" or "devices of a personal nature." He believed that audiotapes of correspondence directed solely to Jordan fell within these categories. He did, however, offer to open up discussions "so that we can find a service provider to accommodate her disability." Def. Ex. G at 9.

Green, who still knew nothing of the VCA in Jordan's file, also contacted Linda Sanford, an Equal Opportunity Specialist with the HUD Fair Housing Division in Columbus, Ohio. Sanford and her Enforcement Branch Chief agreed with Green

that the requested accommodation constituted an undue administrative burden.[2]
She encouraged Green to continue to engage in an interactive process to find an
alternative accommodation.  Def. Ex. E.

On October 17, 2012, Green again wrote to Lavey, reiterating his position
that the federal regulations did not require GDPM to transmit all correspondence
via audiotapes.  He indicated that he had spoken to the Access Center for
Independent Living, and to two Fair Housing officers at HUD, who agreed that the
requested accommodation constituted "an administrative burden" and was not
legally required.  Def. Ex. G at 10.

On November 21, 2012, Lavey responded to Green.  She denied that the
audiotapes were the equivalent of "readers for personal use or study, or other
devices of a personal nature," 24 C.F.R. § 9.160 (a)(1)(ii).  She maintained that
they were instead "auxiliary aids," as defined in 42 U.S.C. § 12103.  She further
noted that Green had provided no evidence that Jordan's request constituted an
undue financial and administrative burden on GDPM.  In addition, Lavey questioned
Green's decision that GDPM would no longer provide Jordan with any audiotapes
or read documents to her over the phone.  She stated, "I realize that there may be

---

[2]  HUD has recently taken the position that Sanford had no authority to render a
decision concerning whether the requested accommodation was reasonable or
constituted an undue financial or administrative burden.  HUD further found that
GDPM violated the VCA and Section 504 by refusing to send copies of all
correspondence to Jordan on audiotapes.  As a result, HUD has threatened to
withdraw GDPM's federal funding and to impose other sanctions. *See* January 24,
2014, Letter of Findings of Non-Compliance, from HUD to GDPM.  Doc. #30-1,
PageID##824-27.

some dispute as to the format; however, doing nothing is unacceptable." *Id.* at 12-13.

On November 26, 2012, Green reiterated his position, and again offered to engage in an interactive process to find an alternative solution involving the assistance of an outside service provider. He noted that Linda Sanford of HUD was available to discuss the matter with him and Lavey. *Id.* at 14-15. A conference call was held on December 11, 2012.

At the suggestion of Sanford and Green, Lavey subsequently contacted the Vision Department for Goodwill in Dayton and the Bureau of Services for the Visually Impaired. In a letter dated February 20, 2013, Lavey stated that neither agency was able to provide free reading services to Jordan. She further stated that, even if they could, this was not the reasonable accommodation that Jordan had requested. She threatened a lawsuit unless GDPM provided the requested accommodation. *Id.* at 23-24. On February 27, 2013, Green notified Lavey that GDPM would not provide the requested accommodation. *Id.* at 25-26.

On August 22, 2013, Jordan filed the above-captioned Complaint, Doc. #2, along with her Motion for Preliminary Injunction, Doc. #1. Jordan maintains that without the microcassette tapes, she faces an ongoing risk of unknowingly missing a required appointment or a deadline, and subsequently being terminated from the Voucher Program. She alleges that, because she cannot afford to pay rent on her own, this could result in homelessness.

7

Following limited discovery, the Court held an evidentiary hearing on January 16, 2014, and January 23, 2014, and asked the parties to file post-hearing briefs. Plaintiff's brief, Doc. #30, was filed on February 25, 2014. GDPM's brief, Doc. #32, was filed on March 19, 2014. Plaintiff submitted a reply on March 27, 2014, Doc. #33. Before turning to the merits of Jordan's motion for preliminary injunction, the Court must resolve the parties' Objections to the proffered exhibits.[3]

## II.    Objections to Exhibits

### A.    GDPM's Objections to Plaintiff's Exhibits (Doc. #25)

Plaintiff's Exhibit 9 is the Voluntary Compliance Agreement ("VCA"), dated September 25, 2006, between HUD and DMHA. The VCA grew out of the complaint that Jordan filed with HUD concerning DMHA's failure to provide her with audiotapes of written correspondence. In Section III(A)(1) of the VCA, DMHA specifically agreed "to provide audiotapes of all written correspondence sent to Complainant."

GDPM argues that Exhibit 9 is irrelevant, unfairly prejudicial, confuses the issues, and misleads the finder of fact, and should be excluded under Federal Rules of Evidence 401, 402, and 403. GDPM notes that HUD is not a party to this case, and the VCA specifically provides that it is not an admission of a Section 504

_____

[3]  All exhibits neither objected to nor withdrawn are deemed admitted without objection.

violation. GDPM maintains that the VCA is not relevant to the question of whether federal law requires GDPM to comply with Jordan's requested accommodation.

The Court OVERRULES GDPM's Objection with respect to Plaintiff's Exhibit 9. The VCA is proof that, in response to Jordan's previous requests for accommodation, DMHA agreed to provide "all written correspondence" on audiotape. This is relevant to a determination of whether Jordan's current requested accommodation is reasonable and whether it constitutes an undue burden. Moreover, although HUD is not a party to this case, GDPM has relied on statements by certain HUD employees, and Linda Sanford in particular, to justify the refusal to comply with Jordan's request. To the extent that the position taken by HUD in connection with the VCA appears to conflict with Sanford's statements, the VCA is relevant to the issues at hand.

Moreover, the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the trier of fact. *See* Fed. R. Evid. 403. As GDPM itself notes, the VCA contains no admission of liability. With respect to the question of whether the requested accommodation constitutes an undue administrative and financial burden, it could be argued that, at least in 2006, DMHA did not find Jordan's request to be unduly burdensome. But the fact that it was not an undue burden then does not necessarily mean that it is not an undue burden now, particularly in light of recent budget cuts at GDPM, and the allegedly expanded scope of Jordan's requested accommodation. The trier of fact can make that distinction with little

9

risk of confusion.  GDPM's Objections go to the weight to be given the evidence, rather than its admissibility.

Plaintiff's Exhibit 15 is a policy statement of the Montgomery County Department of Job and Family Services ("DJFS"), concerning communication with visually impaired clients.  It indicates that options include oral presentations and audio recordings.  Citing Federal Rules of Evidence 401, 402, and 403, GDPM maintains that because DJFS is not a party to this litigation, this exhibit is irrelevant, confuses the issues and misleads the finder of fact.  GDPM further notes that no DJFS employee testified about the scope or application of the policy.

The Court SUSTAINS GDPM's Objection as to Plaintiff's Exhibit 15.  The policy statement of another agency concerning its communications with visually impaired clients is irrelevant to the issues in this case.  Notably, when Jordan's counsel attempted to question Green about this policy statement at the evidentiary hearing, the Court sustained GDPM's objection as to relevancy.  Tr. at 311-12.

**B.    Plaintiff's Objections to GDPM's Exhibits (Doc. #26)**

After Jordan filed numerous Objections to GDPM's proffered exhibits, GDPM chose to withdraw Exhibits C, D, F, H, I, J, K, O, Q, and S.  With respect to the remaining Objections, Jordan argues that the following exhibits are irrelevant, and that GDPM failed to lay a proper foundation for their admission:  (1) Ex. A1 -- pages 2-15; (2) Ex. A2 -- pages 1-6, and 11; (3) Ex. A3 -- pages 1-8, and 31-39; (4) Ex. A4; (5) Ex. A5; (6) Ex. A6 -- pages 3-19, and 23-29; (7) Ex. A7 -- pages 1-60, 64-72, 86-88, 95-96, and 102-169; (8) Ex. A8 -- pages 17-35; (9) Ex. A9 --

all pages except 5-8; (10) Ex. A10 -- all pages except 13-15; (11) Ex. A11 -- all pages except 88, 165-167; (12) Ex. A12 -- all pages except 1-3, 51, 99-100, 157, 192-95; (13) Ex. A13 -- all pages except 1-10, 99-100; and (14) Ex. E.

Each subsection of Exhibit A contains documents related to Jordan's numerous tenancies with DMHA and GDPM.  The Court OVERRULES Plaintiff's Objections to the admission of these exhibits.  Elaine Letton laid a proper foundation for their admission when she testified that they were kept in Jordan's file in the ordinary course of business, and that she was familiar with the documents through her direct involvement with Jordan and her supervision of the housing specialists.  Tr. at 129-30.  Moreover, the pages at issue are relevant to the question of the amount of paperwork generated in connection with each tenancy.  This, in turn, goes directly to the question of whether providing all correspondence on audiotape constitutes an undue administrative or financial burden.

Exhibit E consists of a series of three emails between Linda Sanford and Christopher Green.  The Court also OVERRULES Plaintiff's Objections to this exhibit.  GDPM laid a proper foundation when Green testified about the contents of these emails.  Tr. at 277-79.  Moreover, the content is clearly relevant to GDPM's decision to stop sending audiotapes to Jordan.  Exhibit E is therefore admissible.

Jordan also maintains that GDPM failed to lay a proper foundation for the admission of Exhibits B1 through B10, B12 through B29, and Exhibit G, pages 3-5. The Court OVERRULES Plaintiff's Objection to Exhibits B1 through B10, and B12

11

through 29.  Elaine Letton laid a proper foundation for the admission of these

exhibits, identifying them as the "mandatory HUD forms that have to be signed

and the different verifications that are required for recertification and leasing."  Tr.

at 165-66.

The Court, however, SUSTAINS Plaintiff's Objection to pages 3-5 of Exhibit

G.  These pages appear to consist of a list of housing units for rent.  A

handwritten notation indicates that the list was emailed to Jordan on June 13,

2012.  GDPM has failed to identify any portion of the transcript in which a witness

testified about this particular communication.


III.    **Preliminary Injunction Standard**

"The purpose of a preliminary injunction is always to prevent irreparable

injury so as to preserve the court's ability to render a meaningful decision on the

merits."  *United Food & Commercial Workers Union, Local 1099 v. Southwest*

*Ohio Reg'l Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998) (quoting *Stenberg v.*

*Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978)).

In deciding whether to issue a preliminary injunction, the Court must

consider four factors: "(1) the movants' likelihood of success on the merits of their

claim; (2) whether the movants would suffer irreparable injury without the

injunction; (3) whether issuance of the injunction would cause substantial harm to

others; and (4) whether issuance of the injunction would serve the public interest."

*Eden Foods, Inc. v. Sebelius*, 733 F.3d 626, 631 (6th Cir. 2013).  All factors must be considered, but no one factor is controlling.  *Id.*

## IV.     Analysis

### A.     Likelihood of Success on the Merits

The first factor to be considered is Jordan's likelihood of success on the merits of her claims.  As noted above, she has alleged violations of the Fair Housing Amendments Act ("FHAA"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), and Title II of the Americans with Disabilities Act ("ADA").

The FHAA provides that it is unlawful "to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling" on the basis of that person's handicap.  42 U.S.C. § 3604(f)(2)(A).  It is discriminatory to refuse "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B).

> To prevail on a claim under 42 U.S.C. § 3604(f)(3), a plaintiff must prove all of the following elements: (1) that the plaintiff . . . is handicapped within the meaning of 42 U.S.C. § 3602(h); (2) that the defendant knew or should reasonably be expected to know of the handicap; (3) that accommodation of the handicap may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation is reasonable; and (5) that defendant refused to make the requested accommodation.

13

*Overlook Mut. Homes, Inc. v. Spencer*, 666 F. Supp.2d 850, 855 (S.D. Ohio

2009) (quoting *DuBois v. Ass'n of Apartment Owners of 2987 Kalakaua*,

453 F.3d 1175, 1179 (9th Cir. 2006), *cert. denied*, 549 U.S. 1216 (2007)).

Section 504 provides that "[n]o otherwise qualified individual with a

disability . . . shall, solely by reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under

any program or activity receiving Federal financial assistance or any program or

activity conducted by any Executive agency. . . " 29 U.S.C. § 794(a). To prevail

on a Section 504 claim, Jordan must prove that: (1) she is a "handicapped person"

under the Act; (2) she is "otherwise qualified" for participation in the program; (3)

she is being excluded from participation in, being denied the benefits of, or being

subjected to discrimination under the program solely by reason of her handicap;

and (4) the program is receiving Federal financial assistance. *Doherty v. Southern

Coll. of Optometry*, 862 F.2d 570, 573 (6th Cir. 1988).

Title II of the ADA provides that "no qualified individual with a disability

shall, by reason of such disability, be excluded from participation in or be denied

the benefits of the services, programs, or activities of a public entity, or be

subjected to discrimination by any such entity." 42 U.S.C. § 12132. To prevail

on her ADA claim, Jordan must prove that: "(1) she has a disability; (2) she is

otherwise qualified; and (3) she is being excluded from participation in, being

denied the benefits of, or being subjected to discrimination under the program

14

solely because of her disability." *Jones v. City of Monroe*, 341 F.3d 474, 477 (6th Cir. 2003).

Under Title II, GDPM, as a public entity, has a duty to ensure that its communications with persons with disabilities are "as effective as communications with others," 28 C.F.R. § 35.160(a)(1), and to "furnish appropriate auxiliary aids and services where necessary" so that individuals with disabilities have an equal opportunity to participate in the program, 28 C.F.R. § 35.160(b)(1).

"Auxiliary aids and services" include "[q]ualified readers; taped texts; *audio recordings*; Brailled materials and displays; screen reader software; magnification software; optical readers; secondary auditory programs (SAP); large print materials; accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 35.104 (emphasis added). Regulations further provide:

> The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. *In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities.* In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

28 C.F.R. § 35.160(b)(2) (emphasis added). HUD regulations indicate that, in determining what type of an auxiliary aid is needed for effective communication,

15

"primary consideration" should be given to what is requested by the individual with the disability.  24 C.F.R. § 8.6(a)(1)(i).

In this case, it is undisputed that: (1) Jordan is "handicapped" or "disabled"; (2) GDPM is aware of her disability; (3) Jordan is "otherwise qualified" to participate in the Voucher Program; (4) GDPM, a public entity, receives federal financial assistance in administering the Voucher Program; (5) Jordan has requested an accommodation for her disability to allow her equal access to the benefits of the Voucher Program; and (6) since October of 2012, GDPM has refused to comply with her request.  The key issues in dispute are whether Jordan's requested accommodation is reasonable, and whether it imposes an undue administrative and financial burden on GDPM.

The Court turns first to the question of whether Jordan's request, that all correspondence from GDPM be sent to her on microcassette tape, is facially reasonable.  In determining whether this is a reasonable accommodation, the Court notes that HUD regulations specifically include "audio recordings" in the definition of "auxiliary aids."  *See* 24 C.F.R. § 8.3 ("For example, auxiliary aids for persons with impaired vision may include readers, Brailled materials, audio recordings, and other similar services and devices.").  Likewise, regulations promulgated under Title II of the ADA include "audio recordings" in the list of auxiliary aids for "individuals who are blind or have low vision."  28 C.F.R. § 35.104.

GDPM's own "Effective Communication Policy" states that GDPM "shall furnish appropriate auxiliary aids and services, where necessary, to afford

16

individuals with disabilities, including individuals with . . . visual . . . disabilities, an equal opportunity to participate in, and enjoy the benefits of, the programs, services and activities conducted by GDPM." The policy defines "Auxiliary Aids and Services" to specifically include "qualified readers, taped texts, *audio recordings*, Brailled materials, large print materials, or other effective methods of making visually delivered materials available to individuals with visual impairments." Pl. Ex. 8 (emphasis added).

Jordan also notes that GDPM's own website states that Section 504 regulations require recipients to take steps to ensure effective communication with applicants, and ensure "that information about their programs is disseminated in a manner that is accessible to persons with disabilities. For example, special communication systems (e.g., TTY for persons who are hearing or speech impaired, *materials on tape* or in Braille) can greatly increase the effectiveness of outreach and ongoing communication." http://www.gdpm.org/about-dmha/ agency-performance/section-504.html (accessed March 17, 2014) (emphasis added).[4]

Despite these regulations and GDPM's own policy statements, GDPM maintains that it is not required to provide audiotapes of written correspondence sent to Jordan. In support of this position, GDPM relies heavily on portions of

---

[4]   The Court may take judicial notice of factual information found on the Internet. *See, e.g., City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 655 n.1 (6th Cir. 2005); *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007).

17

three similarly-worded federal regulations. The first is a regulation promulgated by

HUD, concerning effective communication by recipients of federal funding. It

provides, in relevant part, as follows:

> (a) The recipient shall take appropriate steps to ensure effective communication with applicants, beneficiaries, and members of the public.
>
> > (1) The recipient shall furnish appropriate auxiliary aids where necessary to afford an individual with handicaps an equal opportunity to participate in, and enjoy the benefits of, a program or activity receiving Federal financial assistance.
> >
> > > (i) In determining what auxiliary aids are necessary, the recipient shall give primary consideration to the requests of the individual with handicaps.
> > >
> > > (ii) *The recipient is not required to provide individually prescribed devices, readers for personal use or study, or other devices of a personal nature.*
>
> *    *    *
>
> (b) The recipient shall adopt and implement procedures to ensure that interested persons (including persons with impaired vision or hearing) can obtain information concerning the existence and location of accessible services, activities, and facilities.
>
> (c) This section does not require a recipient to take any action that the recipient can demonstrate would result in a fundamental alteration in the nature of a program or activity or in *undue financial and administrative burdens*. If an action would result in such an alteration or burdens, the recipient shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that, to the maximum extent possible, individuals with handicaps receive the benefits and services of the program or activity receiving HUD assistance.

24 C.F.R. § 8.6 (emphasis added). *See also* 24 C.F.R. § 9.160 (containing similar

provisions governing effective communication).

In a similar manner, a regulation promulgated to effectuate Title II of the ADA provides that a public entity is not required "to provide to individuals with disabilities personal devices, such as wheelchairs; individually prescribed devices, such as prescription eyeglasses or hearing aids; readers for personal use or study; or services of a personal nature including assistance in eating, toileting, or dressing." 28 C.F.R. § 35.135.

Relying on these regulations, GDPM draws a proverbial line in the sand concerning what types of documents must be provided in an accessible format to individuals with disabilities. GDPM apparently concedes that it may be required to provide audiotapes of any brochures or other similar materials that may be generally applicable to anyone interested in the Voucher Program. GDPM argues, however, that providing an audiotape of any correspondence directed solely to an individual participant is akin to providing a "device of a personal nature" or providing a "reader for personal use or study." As such, GDPM argues that it is not legally required to provide audiotapes of any "personal" correspondence.

There is, quite simply, no support in the law for GDPM's strained interpretation of the applicable regulations. The law guarantees not only equal access to information *about* a program, but equal access to the program *itself*. A visually-impaired individual does not have an equal opportunity to participate in, and enjoy the benefits of, the Voucher Program, unless *all* communication affecting continued participation in the program is provided in an accessible format. This obviously includes communication that is specific to individual participants. As

19

previously noted, participation in the Voucher Program entails a good deal of paperwork on the part of the tenant.  Participants who fail to keep appointments, or fail to complete required forms in a timely manner, are subject to termination from the program.  Therefore, effective communication is essential to equal access.

Notably, GDPM's own website states that "materials on tape . . . can greatly increase the effectiveness of outreach *and ongoing communication*." http://www.gdpm.org/about-dmha/ agency-performance/section-504.html (accessed March 17, 2014) (emphasis added).  Moreover, Title II regulations state that auxiliary aids must be provided "in such a way as to protect the *privacy and independence* of the individual with a disability."  28 C.F.R. § 35.160(b)(2) (emphasis added).  Privacy and independence concerns are implicated to a much greater degree with respect to an agency's communications specific to an individual program participant.

Courts have frequently required housing authorities to provide visually-impaired program participants with notices and other individualized communication in an accessible format.  *See, e.g., Greene Cnty. Metro. Hous. Auth. v. Manning*, 2d Dist. No. 98-CA-55, 1999 WL 76456 (Ohio Ct. App. Feb. 19, 1999) (holding that housing authority had to provide eviction notice and recertification notice in a format accessible to blind plaintiff); *Robbins v. Connecticut Inst. for the Blind*, No. 3:10cv1712, 2012 WL 3940133 (D. Conn. Sept. 10, 2012) (holding that blind plaintiff established prima facie case of disability discrimination when defendant

20

failed to send notice via audiotape of need for Section 8 recertification and then denied request for extension of deadline).

Accordingly, an audiotape made for the purpose of communicating specific information to one particular program participant is not a "device of a personal nature" as that term appears in the federal regulations.  Likewise, employees who make audiotapes of program-related communications directed to an individual participant are not "readers for personal use or study."  To interpret these terms in this manner would render meaningless much of the law concerning effective communications with individuals with disabilities and equal access to federally-funded programs.  Although GDPM is not required to provide someone to read Jordan's other mail, or newspapers or library books, it must provide all communication related to her participation in the Voucher Program in a format that is accessible to her.

Based on the foregoing, the Court finds that Jordan is likely to satisfy her burden of proving that her requested accommodation is facially reasonable.  The burden would then shift to GDPM to establish the affirmative defense that Jordan's request constitutes an undue financial or administrative burden.  *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999).  GDPM argues that since 2006, when DMHA and HUD entered into the VCA, two things have changed:  (1) the scope of Jordan's request has broadened; and (2) significant budget cuts have occurred within the agency.

21

The VCA required DMHA to provide Jordan with audiotapes of "all written *correspondence*" sent to her. Pl. Ex. 9 (emphasis added). In contrast, Jordan's attorneys are now demanding "that all *communication* be in a format that is accessible to her." Def. Ex. G, at 7-8 (emphasis added). According to Green, this significantly expands the scope of the requested accommodation. Tr. at 273-74. He maintains that the term "correspondence" is limited to letters and notices of meetings, and does not include other written materials such as inspection reports.

The Court disagrees. There is no meaningful distinction between "all correspondence" and "all communication." The terms are synonymous. Despite Green's current attempt to limit the term "correspondence" to letters and notices, the record shows that DMHA also previously provided audiotapes of various forms, including "HUD-52646, RTA Packet, Blank Lease, [and] Lease Addendum HUD 52641A." Def. Ex. P, at 14. This is consistent with the law's requirement that all communication related to Jordan's continued participation in the Voucher Program be provided to her in an accessible format.

Although the Court finds that the scope of Jordan's request has not increased, there can be no doubt that the resources available to GDPM to accommodate that request have significantly decreased over the past few years. At the evidentiary hearing, Elaine Letton, senior manager for GDPM's Housing Choice Voucher Program, testified that GDPM receives two streams of income from HUD. One stream is directed solely to the subsidies paid to the landlords; the

other stream is used for administrative expenses such as salaries, benefits, supplies, postage and utility bills. Tr. at 114-16.

Prior to 2012, GDPM received over $50.00 per month in administrative fees for each family under lease. In 2012, that amount dropped to approximately $37.00 per month (approximately $440 per year). *Id.* at 116. With approximately 3600 families under lease, this equates to administrative funding of approximately $139,000 per month. *Id.* at 260.

These budget cuts have required GDPM to reduce staffing levels. There are currently only six housing specialists; three other positions remain unfilled. Each housing specialist is responsible for over 500 families. For each family, the housing specialist must complete a yearly recertification, gather information from third parties, answer questions, and process all necessary paperwork. Additional paperwork is required each time a family moves. *Id.* at 113-14.

GDPM argues because of the funding cuts and reduced staffing levels, it would be an undue financial and administrative burden to provide Jordan with audiotapes of all written communication. Letton testified that the responsibility for doing so would fall on the housing specialists, who are already overworked. The housing specialists are paid $16.00 per hour, plus benefits. Although GDPM also employs several inspectors, auditors, a team leader, and a receptionist, these employees are not available to help. Letton testified that there are also two temporary employees, but she would not trust them with that task. *Id.* at 172, 218-19.

23

Letton also testified that there are as many as thirty-seven different forms that GDPM is required to send to Jordan each year. Depending on the situation, some forms may need to be sent more than once. *Id.* at 200. Twenty-nine of those forms were identified at the evidentiary hearing as Defendants' Exhibits B1-B29, a total of 126 pages. GDPM maintains that it would take a housing specialist "over a hundred hours" each year to read all of these documents onto audiotapes, and take time away from other clients. At $16.00 per hour, it would allegedly cost GDPM approximately $1600 per year to accommodate Jordan's request. *Id.* at 166-68, 213. GDPM notes that this is almost four times the $440 allocated by HUD for each family's yearly administrative fees.

Based on the evidence presented at the hearing, however, the Court finds it unlikely that GDPM will be able to prove that granting Jordan's request will constitute an undue administrative or financial burden. Letton and Green both admitted that they made no attempt to calculate the actual financial or administrative cost of granting Jordan's requested accommodation before deciding to stop sending audiotapes. Letton merely knew that it was "a lengthy process to read these documents," and she told Green that it took "a lot of time." *Id.* at 197-99, 314. GDPM has presented very little evidence of how it calculated the 100-hour-per-year figure.

Jordan maintains that GDPM's 100-hour/$1600-per-year estimate is greatly exaggerated. At the hearing, Jordan's counsel asked Letton to read a one-page "Notice of Rent Change" into the record. Letton admitted that this was the same

24

type of document that she would have included in her 100-hour calculation.  It took her less than three minutes to read the document out loud.  Tr. at 210-13. Multiplying the 126 pages contained in Exhibits B1-B29 times three minutes per page, Jordan argues that this equates to just 378 minutes or 6.3 hours per year. If all of these documents were read by a housing specialist making $16.00 per hour, the total annual cost would be just over $100.00, plus the cost of the microcassettes and postage.  Even if there were several additional documents, and even if some of the documents had to be sent more than once each year, it appears that the actual time and money involved are still substantially less than GDPM's estimate.  Jordan further argues that even if GDPM's 100-hour/$1600-per-year estimate is correct, this is still just a tiny fraction of GDPM's annual administrative budget of more than $1.6 million.

Accommodating the needs of individuals with disabilities in order to provide them with equal access to federally-funded programs will almost always result in *some* administrative and financial burden on the agencies that administer those programs.  When those agencies also face ongoing budget cuts, it is sometimes difficult to provide the necessary accommodations.  Nevertheless, unless the accommodation constitutes an "undue" administrative or financial burden, it is a cost that must be borne.

In the Court's view, based on the evidence presented thus far, GDPM is unlikely to be able to show that Jordan's request crosses that threshold.  As Jordan correctly points out, the $440 per year in administrative fees that GDPM

25

receives for each family are not earmarked for any particular purpose, and the cost of accommodating a disability does not constitute an "undue financial burden" simply because it exceeds that amount.

For the reasons set forth above, the Court finds that Jordan has demonstrated a likelihood of success on the merits of her claims.

### B. Irreparable Injury

The second factor to be considered is whether Jordan will likely suffer irreparable injury if the preliminary injunction is not granted. In a housing discrimination case, irreparable injury is presumed once a plaintiff shows a likelihood of success on the merits. *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984); *Rogers v. Windmill Pointe Village Club Ass'n*, 967 F.2d 525, 528-29 (11th Cir. 1992); *Cousins v. Bray*, 297 F. Supp.2d 1027, 1041 (S.D. Ohio 1996). Given that the Court has found that Jordan is likely to succeed on the merits of her claims, irreparable injury is presumed.

Moreover, "where the plaintiff seeks an injunction to prevent the violation of a federal statute that specifically provides for injunctive relief, [she] need not show irreparable harm." *Illinois Bell Tel. Co. v. Illinois Commerce Comm'n*, 740 F.2d 566, 571 (7th Cir. 1984). That is the situation presented here. Accordingly, the

26

Court need not reach the question of whether Jordan has demonstrated that she is likely to suffer *actual* irreparable harm if the preliminary injunction is not granted.[5]

### C.    Substantial Harm to Others

The third factor to be considered is whether issuance of the preliminary injunction will result in substantial harm to others.  GDPM again cites the allegedly significant administrative and financial burden that will result if its employees are required to read all correspondence to Jordan onto audiotapes.  As the Court has

_____

[5]   Jordan maintains that if she is not provided all correspondence on audiocassettes, she faces a risk of termination from the Voucher Program, possible eviction and homelessness.  GDPM argues that these alleged risks are illusory because, as it has always done in the past, it remains willing to do whatever is necessary to ensure her continued participation in the Voucher Program.  GDPM denies that any of Jordan's failed tenancies resulted from a failure to provide her with audiotapes of correspondence.

The Court need not address the question of actual irreparable injury.  The Court nevertheless notes that, despite GDPM's laudable past efforts and its promises to "bend the rules" when necessary to ensure that Jordan is not terminated from the Voucher Program, the risk of termination still exists.  In fact, on February 14, 2014, GDPM sent Jordan a written Notice of Proposed Termination, indicating that she was "no longer eligible for continued participation with the Housing Choice Voucher Program," because she failed to repair certain items that were her responsibility.  Doc. #33-1, PageID#899.

The Court also notes the considerable testimony indicating that Jordan is a difficult client and tenant.  Evidence shows that she has often failed to return phone calls and keep appointments with GDPM.  She has also repeatedly failed to cooperate with her landlords.  She has refused to answer their phone calls, refused to answer the door to allow inspections, refused to pay the rent and other bills, and had friends change the locks.  On one occasion, she even threatened her landlord with bodily harm.  Tr. at 61, 88-89, 131-33, 137-39, 145-46, 152-53, 156-57, 162.

Jordan is cautioned that, although GDPM has a legal duty to provide correspondence concerning her participation in the Voucher Program in an accessible format, she also has a corresponding legal and ethical duty to cooperate with GDPM and with her landlords.  Her disability will not shield her from negative legal consequences resulting from her own obstructive behavior.

previously found, however, the alleged extent of that burden is not supported by the record.  Although GDPM may be required to divert some of its resources to accommodate Jordan's request, there is little evidence that this will result in "substantial harm" to GDPM, its employees, or other participants in the Voucher Program.

### D.    Public Interest

The final factor to be considered is whether issuance of the preliminary injunction would serve the public interest.  Jordan maintains that "there is a significant public interest in eliminating discrimination against individuals with disabilities." *Thomas v. Davidson Academy*, 846 F. Supp. 611, 620 (M.D. Tenn. 1994). *See also Sellers v. University of Rio Grande*, 838 F. Supp.2d 677, 687 (S.D. Ohio 2012) (citing "the public interest in affording accommodations for disabilities" in support of decision extending a temporary restraining order).

GDPM argues that the public interest would not be served by granting Jordan's motion, because it will require GDPM and other housing authorities to expend scarce resources during a time of severe budget cuts.  GDPM also argues that granting injunctive relief would burden the Court, which will likely be repeatedly called upon to enforce the order.

It is clearly in the public interest for the Court to enforce compliance with federal law prohibiting discrimination on the basis of disability.  Although the law may impose a burden on public agencies, which are all struggling to make do with limited resources, that burden must be balanced against the countervailing interest

28

of providing equal access to federally funded programs.  And although enforcing the preliminary injunction may also "burden" the limited resources of the district court, the court exists for the very purpose of enforcing compliance with the law. For these reasons, the Court finds that the public interest is served in granting Jordan's motion for a preliminary injunction.

## V.    Conclusion

Having carefully weighed each of the factors set forth above, the Court SUSTAINS Plaintiff's Motion for Preliminary Injunction, Doc. #1.  Until such time as this matter is fully resolved, either through continued litigation or a negotiated settlement, GDPM is ordered to provide microcassette tapes of all written materials it sends to Renee Jordan.

The Court will hold a telephone status conference on Thursday, April 10, 2014, at 4:00 p.m. to determine the next step in this litigation.  In the meantime, in view of all that has been discussed herein, before any additional attorneys' fees are incurred, the Court strongly urges the parties to attempt to resolve this matter. A negotiated settlement would appear to be even more advantageous in light of HUD's January 24, 2014, Letter of Findings of Non-Compliance, threatening to withdraw GDPM's federal funding.[6]

---

[6]   In ruling on Plaintiff's Motion for Preliminary Injunction, the Court has not relied on HUD's Letter of Findings of Non-Compliance.  Notably, that Letter does not constitute a final agency determination, but even if it did, the Court has a duty to independently evaluate Plaintiff's alleged violations of federal law.

29

Date: March 28, 2014

WALTER H. RICE
UNITED STATES DISTRICT JUDGE